UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

AMY J. MCCLUSKEY,

                    Plaintiff,

       v.

ESA MANAGEMENT, LLC,

                    Defendant.

Case No. C26-1033-SKV

ORDER GRANTING MOTION TO REMAND

       Amy McCluskey ("Plaintiff"), proceeding individually and on behalf of a proposed class, moves to remand this action.  *See* Dkt. 9.  ESA Management, LLC ("Defendant") opposes.  *See* Dkt. 13.  The Court, having considered Plaintiff's motion and all documents filed in support and opposition, herein GRANTS the motion to remand upon finding jurisdiction in this Court has not been established under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).

                    I.       BACKGROUND

       Plaintiff worked for Defendant, owner of hotels and extended stay lodgings in Washington, as a Guest Services Representative from 2022 to October 2025.  *See* Dkt. 3-10 at 3. Throughout that time, Plaintiff alleges that she typically worked shifts eight to sixteen hours long and, at times, worked more than forty hours per week.  *See id.* at 7.  Her base pay in 2025 totaled

ORDER GRANTING MOTION TO REMAND - 1

$20.24 per hour.  *See id.*  Plaintiff alleges that, on account of Defendant's scheduling and timekeeping policies and practices, Defendant violated the Washington Industrial Welfare Act and the Washington Minimum Wage Act.  Specifically, she claims that Defendant failed to (1) provide compliant meal and rest periods at the intervals required by Washington law and compensate employees for missed or noncompliant breaks, (2) pay minimum wage for all hours worked, due to off-the-clock work performed, and (3) pay overtime wages due.  *See id.* at 8–13.

On January 8, 2026, Plaintiff filed this putative class action lawsuit in King County Superior Court seeking compensatory and statutory damages, attorney's fees, costs, and prejudgment interest.  *See* Dkt. 1-1 at 13–14.  She proposed a class comprised of  "[a]ll current and former hourly-paid employees who worked for any one or more of the Defendants at any location in Washington State at any time from three years prior to the filing of the Complaint through the date of the Court's order certifying the Class[.]"  *Id.* at 4.  On February 18, 2026, Plaintiff amended her complaint to substitute ESA Management, LLC, as the sole defendant.  *See* Dkt. 1 at 2; Dkt. 3-10.  On March 26, 2026, Defendant removed the case to this Court "based upon complete diversity of citizenship of the parties, *see* 28 U.S.C. §§ 1332(a) and 1441, or alternatively the . . . [CAFA], *see* 28 U.S.C. §§ 1332(d) and 1441[.]"  Dkt. 1 at 1 (first emphasis added).  Plaintiff now moves for remand on grounds that the requirements for jurisdiction under the CAFA are not met.  *See* Dkt. 9 at 9.

## II.     LEGAL STANDARD

CAFA vests federal district courts with original jurisdiction over class actions involving 100 or more class members, minimal diversity, and an amount in controversy that exceeds $5 million.  28 U.S.C. § 1332(d).  The amount in controversy refers to the "amount at stake" in the litigation, which "does not mean likely or probable liability; rather, it refers to *possible* liability."

ORDER GRANTING MOTION TO REMAND - 2

*Jauregui v. Roadrunner Transportation Servs., Inc.*, 28 F.4th 989, 994 (9th Cir. 2022) (cleaned up) (quoting *Greene v. Harley-Davidson, Inc.*, 965 F.3d 767, 772 (9th Cir. 2020)); *see also Lewis v. Verizon Communications, Inc.*, 627 F.3d 395, 400 (9th Cir. 2010) ("The amount in controversy is simply an estimate of the total amount in dispute, not a prospective assessment of defendant's liability."). There is no presumption against removal for cases removed under CAFA. *See Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89 (2014) ("[N]o antiremoval presumption attends cases invoking CAFA, which Congress enacted to facilitate adjudication of certain class actions in federal court.").

A notice of removal filed pursuant to CAFA "'need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold,' and need not contain evidentiary submissions." *Ibarra v. Manheim Investments, Inc.*, 775 F.3d 1193, 1197 (9th Cir. 2015) (quoting *Dart Cherokee*, 574 U.S. at 89). "Evidence establishing the amount is required . . . only when the plaintiff contests, or the court questions, the defendant's allegation." *Perez v. Rose Hills Co.*, 131 F.4th 804, 808 (9th Cir. 2025) (alteration in original) (quoting *Dart Cherokee*, 574 U.S. at 89). "If the allegation is disputed, then the party seeking removal—and invoking the jurisdiction of the federal courts—bears the burden of demonstrating by a preponderance of the evidence that the amount in controversy exceeds $5 million." *Id.* (citing *Ibarra*, 775 F.3d at 1199). Both parties may submit evidence outside the complaint, including affidavits, declarations, and other summary-judgment-type evidence, and the Court decides whether jurisdiction lies. *See Ibarra*, 775 F.3d at 1197.

When a removing defendant "relies on a chain of reasoning that includes assumptions to satisfy its burden of proof, the chain of reasoning and its underlying assumptions must be reasonable ones." *LaCross v. Knight Transp. Inc.*, 775 F.3d 1200, 1202 (9th Cir. 2015) (citing

ORDER GRANTING MOTION TO REMAND - 3

*Ibarra*, 775 F.3d. at 1199).  The assumptions "cannot be pulled from thin air but need some reasonable ground underlying them." *Ibarra*, 775 F.3d at 1199.  "An assumption may be reasonable if it is founded on the allegations of the complaint." *Arias v. Residence Inn by Marriott*, 936 F.3d 920, 925 (9th Cir. 2019) (citing *Ibarra*, 775 F.3d at 1198-99).  The burden of demonstrating the reasonableness of the assumptions "remain[s] at all times" with the defendant. *Harris v. KM Indus., Inc.*, 980 F.3d 694, 701 (9th Cir. 2020).  However, the defendant "need not make the plaintiff's case for it or prove the amount in controversy beyond a legal certainty." *Id*. (citations omitted); *see also 54-40 Brewing Co. LLC v. Truck Ins. Exch.*, C21-5586-BHS, 2021 WL 6124788, at *2 (W.D. Wash. Dec. 28, 2021) ("Though the burden remains with the defendant, it is not a daunting one.  Under this standard, a removing defendant is not obligated to completely 'research, state, and prove the plaintiff's claims for damages.'" (quoted source omitted)).

In applying the preponderance of the evidence standard, the district court "should weigh the reasonableness of the removing party's assumptions, not supply further assumptions on its own." *Harris*, 980 F.3d at 701.  There is, however, "an important distinction between a court offering entirely new or different assumptions itself versus modifying one or more assumptions in the removing party's analysis." *Jauregui*, 28 F.4th at 996.  Accordingly, while the Court may reject an assumption that is "unreasonable on its face without comparison to a better alternative," where the reason for rejecting that assumption "is because a different, better assumption is identified[,]" the court "should consider the claim under the better assumption—not just zero-out the claim." *Id.*  Remanding a case where it "would still be inappropriate even under the better assumption" would subvert the purpose of CAFA by resulting in the remand of cases that clearly surpass the $5 million threshold.  *Id.*

ORDER GRANTING MOTION TO REMAND - 4

III.     DISCUSSION

Plaintiff does not challenge Defendant's allegations that the class size exceeds 100 individuals or that there is minimal diversity—only whether the CAFA's $5 million amount in controversy requirement is met.  The only issue before the Court, then, is the amount in controversy.[1]

Plaintiff does not allege an amount in controversy in her Amended Complaint.  In its Notice of Removal, Defendant alleged a $6,770,128.10 amount in controversy.  *See* Dkt. 1 at 9.  It revised that estimate downwards to $5,346,925.00 in its Response to Plaintiff's Motion to Remand, following additional investigation.  *See* Dkt. 13 at 10.  To arrive at both figures, Defendant asserts that it drew on allegations in the Amended Complaint and time clock records.  The Court first summarizes Defendant's original calculations, and Plaintiff's challenge thereto, before evaluating the reasonableness of Defendant's revised assumptions and jurisdictional allegations.

A.     Defendant's Initial Calculations

Defendant asserted that its records indicate that it had approximately 678 hourly employees in Washington who worked approximately 30,304 workweeks during the relevant time period.  *See* Dkt. 1 at 6.  It then uses those figures to estimate its potential exposure for each of Plaintiff's three class claims.

1.     *Meal and Rest Period Claims*

With respect to the meal period claim, Defendant assumed that Plaintiff and the putative class worked five days per week at an average hourly rate of $20.09.  *See* Dkt. 1 at 6–7.  Based

---

[1] While Defendant purports to have removed based on traditional diversity jurisdiction as well, it does not allege any amount in controversy as to Plaintiff's individual claims.  *See* Dkt. 1 at 1.  The Court is therefore not positioned to assess whether traditional diversity jurisdiction lies.

ORDER GRANTING MOTION TO REMAND - 5

on review of Plaintiff's time records, Defendant averred that "she worked 695 shifts . . . during the Putative Class Period of more than five hours and the time records do not show a compliant meal period for 620 of those shifts[.]" *Id.* at 7.  Defendant accordingly proposed that an 89% noncompliance rate derived from Plaintiff's time records be extrapolated to the proposed class. *Id.* ("[]620 / 695 = 89% 'noncompliance rate'").  Applying those assumptions, Defendant concluded "[t]he amount in controversy for the missed meal period claim . . . totals $1,354,596.38 ((30,304 workweeks * 5 workdays per week * 0.89 noncompliance rate) * ($20.09 average hourly rate * 0.5 for 30-minutes per missed meal period))." *Id.*

With respect to the rest period claim, Defendant proposes using a 50% noncompliance rate based on language in the Amended Complaint alleging that "Defendants failed to provide a second rest break before the eighth hour of work and failed to provide a third rest break prior to the twelfth hour of work." *Id.* (citing Dkt. 3-10 at 8).  Defendant concluded "the amount in controversy for the missed rest period claim totals $507,440.93 ((30,304 workweeks * 5 workdays per week * 2 rest breaks per workday * 0.50 percent noncompliance rate) * ($20.09 * 0.1667 hours in rest breaks))." *Id.*

2. *Minimum Wage Claim*

Regarding the claim for off-the-clock work, Defendant proposes "[u]sing an estimate of 30 minutes of off-the-clock work per workweek and the average hourly rate for the Putative Employee Class of approximately $20.09[.]" *Id.*  Applying those assumptions, Defendant represented that "the amount in controversy for the off-the-clock claim totals $304,403.68 (30,304 workweeks * 0.5 hour per workweek * $20.09)." *Id.* at 8.

///

///

ORDER GRANTING MOTION TO REMAND - 6

### 3.  *Overtime Wages Claim*

To approximate unpaid overtime wages, Defendant proposed "[u]sing a conservative estimate of 50% overtime weeks (once the additional time for alleged missed meal periods and rest periods and alleged off-the-clock work is added to hours worked)[.]" *Id.*  With those assumptions, Defendant estimated that "the amount in controversy for the unpaid overtime wage claim totals **$541,610.25** ($2,166,440.99 in back wages * 0.50 overtime weeks * 0.50 overtime premium)." *Id.* (emphasis in original).

### 4.  *Double Damages and Attorney's Fees*

The sum of those estimated back wages totals $2,708,051.24.  Because Plaintiff seeks an award doubling those damages under RCW §§ 49.52.050 and 49.52.070, *see* Dkt. 3-10 at 6, 13, Defendant fixed the damages due at $5,416,102.48, *see* Dkt. 1 at 9.

Plaintiff also seeks attorney's fees and costs, which Defendant estimated at 25% of that sum based on a "benchmark" percentage approved in other cases within this Circuit.  *Id.* (first citing *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989); then citing *Lo v. Oxnard Euro. Motors, LLC*, 2012 WL 1932283, at *3 (S.D. Cal. May 29, 2012)).  Twenty-five percent of the doubled damages totals $1,354,025.62.  Thus, Defendant removed the action based on the sum of those figures, or a $6,770,128.10 amount in controversy.  *See id.*

### B.  Plaintiff's Initial Calculations

Plaintiff first challenges Defendant's jurisdictional allegation on grounds that Defendant did not put forth evidence with their Notice of Removal supporting their proposed violation rates or assumptions that "any putative employee class member worked the requisite shift lengths that would entitle them to meal and rest periods, . . . worked five shifts every single workweek, . . . [or] worked the requisite forty (40) hours in a single workweek to be entitled to overtime pay."

ORDER GRANTING MOTION TO REMAND - 7

Dkt. 9 at 13–14, 18. Plaintiff invites the Court to assign a $0 amount-in-controversy value to her meal and rest periods and overtime wages claims as a result. *See id.* at 16–17. Plaintiff also asserts Defendant has not proven with evidence its 25% attorney's fees estimate and asks the Court to assume a $0 attorney's fee instead. *See id.* at 22–23.

Despite advocating for a $0 amount in controversy estimate for other claims and attorney's fees, Plaintiff adopts Defendant's $304,403.68 estimate regarding her minimum wage claim, premised on the same variables she contests as unsupported, without explanation. *See id.* at 24 & n.2 ("Solely for the purposes of this motion to remand, Plaintiff will adopt Defendant's estimated amount in controversy for the minimum wage claim regarding off-the-clock work."). Doubling that claim's valuation, Plaintiff posits a $608,807.36 amount in controversy. *Id.* at 24 ("$0 (meal periods) + $0 (rest periods) + $304,403.68 (minimum wage) + $0 (overtime) + $304,403.68 (exemplary damages) + $0 (attorneys' fees) = $608,807.36").

In the alternative, Plaintiff challenges Defendant's proposed violation rates. She contests Defendant's extrapolation of an 89% meal period violation rate premised on her time records to the class she seeks to represent on grounds that it is unreasonable to assume class members have identical injuries. *See id.* at 18. She also disputes Defendant's proposed 50% rest period violation rate as untethered to the Amended Complaint, which she asserts alleges violations occurred "often" or "at times." *See id.* at 19–21. In lieu of Defendant's proposed violation rates, Plaintiff proposes using a 20% violation rate used by courts in other cases where the complaints alleged a policy and practice of wage and hour violations. *See id.* at 20–21. Applying her proposed 20% violation rate to all claims, and relying on Defendant's other proposed variables, she estimates a $2,232,405.30 amount in controversy. *See id.* at 25 ("$304,403.68 (meal periods)

ORDER GRANTING MOTION TO REMAND - 8

+ $202,976.38 (rest periods) + $304,403.68 (minimum wage) + $81,178.38 (overtime) + $892,962.12 (exemplary damages) + $446,481.06 (attorneys' fees) = $2,232,405.30").

C.      Jurisdictional Analysis

Before proceeding, the Court clarifies the nature of Plaintiff's challenge.  A plaintiff can contest the amount in controversy alleged by a defendant by mounting either a "facial" or "factual" attack on the defendant's jurisdictional allegations.  *See Harris*, 980 F.3d at 699.  "A facial attack accepts the truth of the [defendant's] allegations but asserts that they are insufficient on their face to invoke federal jurisdiction."  *Id.* (alteration in original) (quoting *Salter v. Quality Carriers*, 974 F.3d 959, 964 (9th Cir. 2020)).  By contrast, a "factual attack 'contests the truth of the . . . allegations' themselves[]" "by making a reasoned argument as to why any assumptions on which they are based are not supported by evidence."  *Id.* at 699–700.  "When a plaintiff mounts a factual attack, the burden is on the defendant to show, by a preponderance of the evidence, that the amount in controversy exceeds the $5 million jurisdictional threshold."  *Id.* at 699 (citing *Ibarra*, 775 F.3d at 1197).  "Both parties may [then] submit evidence supporting the amount in controversy before the district court rules."  *Id.* (first citing *Salter*, 974 F.3d at 963; and then citing *Ibarra*, 775 F.3d at 1197).

Defendant characterizes Plaintiff's attack as facial because she largely focuses on a lack of evidence filed in support of the Notice of Removal's jurisdictional allegations.  *See* Dkt. 13 at 15.  It is true that, throughout her motion, Plaintiff repeatedly objects to Defendant's purported failure to provide evidence with the Notice of Removal.  However, in her Motion to Remand and Reply, Plaintiff asserts that she mounts a factual challenge "contest[ing] the truth of Defendant's specific assumptions with reasoned argument about why one employee's records cannot establish class-wide violation rates."  Dkt. 15 at 6; Dkt. 9 at 12.

ORDER GRANTING MOTION TO REMAND - 9

Defendant was, of course, not obligated to support their jurisdictional allegations with evidence in their notice of removal. *See Perez*, 131 F.4th at 808. As such, Plaintiff's line of argument fundamentally misstates the legal standard by repeatedly attacking the sufficiency of Defendant's initial evidentiary showing. Yet, Plaintiff also unmistakably rejects the truth of Defendant's allegations that extrapolate data from Plaintiff's records to the class. The discrepancy makes it somewhat difficult to categorize her challenge.

Despite urging the Court to classify the challenge as facial, Defendant treats the challenge as factual and puts forth updated evidence with its Response in support of revised assumptions. *See* Dkt. 14. As both parties construe Plaintiff's challenge as factual, the Court does the same.

      1.    *Defendant's Revised Calculations*

Faced with Plaintiff's challenge, Defendant opted to supply evidence in the form of a supplemental declaration by Nadia Herrera, Senior Director of Human Resources for Defendant, and revised its jurisdictional allegations based on further review of its records. *See* Dkt. 14; Dkt. 13 at 10. Based on her review of personnel records, Ms. Herrera asserts that there are roughly 686 employees in the putative class. *See* Dkt. 14 at 2. Those employees worked approximately 28,835 weeks and specifically 120,354 shifts in the relevant period. *See id.* Based on the length of putative class members' shifts, Ms. Herrera states class members were entitled to 112,091 meal breaks and 170,819 rest breaks. *See id.*

Defendant looks once more to Plaintiff's specific experience for violation rates. With respect to meal breaks, it explains that,

> Per Plaintiff's time records, she worked 668 shifts which based on their length, entitled her to 694 meal breaks (inclusive of second meal breaks) and 1,065 rest breaks. Plaintiff's time records reflect no clock out for a meal, a late clock out, or a short meal break (i.e., a possible violation) 89% of the time for first meal breaks only, and 97.2% of the time inclusive of second meal breaks. While a higher rate is available based on Plaintiff's records, Defendant nevertheless relied on the

ORDER GRANTING MOTION TO REMAND - 10

> lower assumed 89% violation rate for meal breaks at $20.09 per hour equaling $1,002,099 in controversy before doubling [112,091 * $20.09 * .5 *.89 = $1,002,099].

Dkt. 13 at 8–9 (citations omitted).  After doubling, that claim totals $2,004,198.00.

With respect to rest breaks, Defendant reasserts its proposed 50% violation rate.  *Id.* at 9.  Defendant asserts that, applying a 50% violation rate to the rest breaks due, "yields $286,551 in controversy, before doubling [170,819 * $20.09 * .167 * .5 = $286,551]" or $573,102.00 after doubling.  *Id.*

Regarding the minimum wage claim, Defendant asserts that "having further refined the workweeks for the putative class, the correct figure utilizing .5 hours per week is $289,648 before doubling [28,835 * $20.09 *.5 = $289,648]" or $579,296.00 total.  *Id.*

Moving to the overtime wages claim, Defendant again revises its calculations based on review of personnel records, splitting the claim into two calculations based on Plaintiff's allegations.  First, it calculates the overtime triggered by the other alleged labor violations.  It explains that

> Plaintiff's time records show that she worked overtime almost 50% of the time (48.92%).  Notably, it is Plaintiff's claim that overtime is underreported in the time records, not only because of meal and rest breaks not taken and ones that show as taken but she says were not, but also because she alleges that Defendant engaged in time shaving and "deleting hours worked over 40."  Accordingly, applying a 49% overtime rate understates Plaintiff's claim as set out in the Amended Complaint.  Extrapolating a 49% overtime frequency across the class yields $386,683 in controversy, before doubling.  [($1,002,099 + $286,551 + $289,648) * .49 * .5 = $386,683].

*Id.* at 10 (citations omitted).  After doubling, that component of the overtime claim totals $773,366.00.  Next, it addresses Plaintiff's time shaving or editing theory, assuming that

> Defendant's alleged deletion of time over 40 hours in a week[] . . . happened in 20% of workweeks, with one hour shaved/deleted each time, add[ing] $173,789 [28,835 * $20.09 * .2 * 1.5 = $173,789][]

ORDER GRANTING MOTION TO REMAND - 11

to the amount in controversy, before doubling. *Id.* After doubling, that component of Plaintiff's overtime claim totals $347,578.00.

Adding those revised figures together, Defendant arrives at a sum of $2,138,770.00, which after doubling yields a total of $4,277,540.00. Factoring in a 25% attorney's fee of $1,069,385.00, Defendant estimates the total amount in controversy to be $5,346,925.00. *Id.*

2.      *Plaintiff's Reply*

Presented with these revised figures, Plaintiff largely reiterates the same challenges to violation rates and overtime frequency assumptions derived from Plaintiff's time records and urges the Court to apply a 20% violation rate across claims. Dkt. 15 at 8, 12, 15. Plaintiff also disputes application of a 25% benchmark for attorney's fees as speculative and not supported by evidence. *See id.* at 18. Plaintiff did not file any evidence in support of her positions.

3.      *The Court's Calculations*

At the outset, the Court necessarily rejects Plaintiff's first proposal—zeroing out all claims but one, and presuming no attorney's fees—as patently unreasonable and counter to Ninth Circuit case law. *See Jauregui*, 28 F.4th at 996 (where a "better assumption is identified[,] . . . the district court should consider the claim under the better assumption—not just zero-out the claim."); *Arias*, 936 F.3d at 928 (holding the district court erred by excluding prospective attorney's fees from the amount in controversy."). The Court also rejects Plaintiff's alternative invitation to apply a 20% violation rate across all claims. As discussed below, the Amended Complaint and evidence offered by Defendant do not support such a uniform approach. The Court therefore moves directly to evaluating the reasonableness of Defendant's revised assumptions as to each variable and the evidentiary support underpinning them. To the extent better assumptions have been identified or are apparent from the record, the Court applies them.

ORDER GRANTING MOTION TO REMAND - 12

Regarding Defendant's assumptions applied across claim estimates, Defendant assumes, based on a review of time and employee records, that there are approximately 686 individuals in the putative class, that those employees worked approximately 28,835 weeks and specifically 120,354 shifts in the relevant period.  Defendant also assumes that those employees were entitled to 112,091 meal breaks and 170,819 rest breaks based upon the length of their shifts.  Defendant based those assumptions on review of its time clock and personnel records and the state law at issue, which prescribes one meal break for every five hours worked and one rest break for every four hours worked.  *See* Dkt. 14 at 2; WAC 296-126-092.  The Court finds those preliminary assumptions reasonable and adequately supported.  However, it finds Defendant's methodology and proposed violation rates unreasonable in a few respects.  The Court addresses those issues claim by claim.

a.      *Meal and Rest Period Claims*

In her Amended Complaint, Plaintiff alleges that meal period violations occurred "routinely," "often," and "frequently."  She also asserts that, "at times," especially during the early part of her employment, she was not required to clock out for meal periods despite being forced to work through them.  Further, Plaintiff categorically alleges that "when" she worked three or more hours beyond her normal workday, she did not receive a second meal period, and that Defendant did not compensate her for missed meal periods.  Dkt. 3-10 at 8.

"District courts in this circuit have found that when the alleged violations are defined as a 'pattern and practice,' or similar language, a 20% to 60% violation rate is appropriate." *Washington v. Kerry Inc.*, No. C25-0965-TL, 2025 WL 3089015, at *8 (W.D. Wash. Nov. 5, 2025) (collecting cases).  "[A] 'common practice' of alleged violations has been found to be a 50% violation rate." *Id.* (quoting *Soratorio v. Tesoro Refining Mktg. Co., LLC*, No. C17-1554,

2017 WL 1520416, at *3 (C.D. Cal. Apr. 26, 2017)).  A "uniform practice" can support a 60% to 100% violation rate.  *Alvarez v. Off. Depot, Inc.*, No. CV177220PSGAFMX, 2017 WL 5952181, at *3 (C.D. Cal. Nov. 30, 2017).  In contrast, courts in this district have found that "'at times,' . . . generally implies the alleged illegal conduct. . . did not happen consistently," and may support a 20% violation rate.  *Washington*, 2025 WL 3089015, at *8 (citing *Young v. Lab'y Corp. of Am.*, No. C23-5892-DGE, 2024 WL 689605, at *5 (W.D. Wash. Feb. 20, 2024)).

Here, Plaintiff alleges that meal break violations were routine or frequent, but she does not go so far as to allege a uniform practice.  Her allegations are substantively similar to the "pattern" and "common practice" allegations recognized to allege more frequent violations than vague "at times" allegations.  *See Young*, 2024 WL 689605, at *5.  As such, a violation rate above 20% but below 60% would align with those applied in other cases.

Per Defendant, Plaintiff's time records indicate at least an 89% violation rate for her meal breaks.  Plaintiff's specific experience, while not reasonably extrapolated to the entire class solely based on her claims' alleged typicality of the class claims, could be instructive in narrowing that broad range.  *See Vigna v. Allstate Ins. Co.*, No. C16-5474 BHS, 2016 WL 4361810, at *3 (W.D. Wash. Aug. 16, 2016) ("Rule 23's typicality requirement concerns whether each class member's claim arises from the same course of events and involves similar legal arguments. . . . [T]he typicality element of a class action, by itself, does not allow [the Court] to infer that the *amounts* of the named plaintiffs' claims are similar to those of other class members." (citations omitted)); *see also Urias v. Labcorp Peri-Approval & Commercialization Inc.*, 710 F. Supp. 3d 838, 846 (S.D. Cal. 2024) ("Defendant cannot support its violation rate assumption solely by referencing Plaintiff's alleged work schedule. . . . [T]he typicality condition set by Federal Rule of Civil Procedure 23(a)(3) requires only 'that the named

ORDER GRANTING MOTION TO REMAND - 14

plaintiff's claims are reasonably coextensive with those of absent class members; they need not be substantially identical.' 'Because the claims need not be identical, typicality provides no grounds from which to extrapolate the amount in controversy.'" (citations omitted)).  The Court finds it reasonable, then, to apply a violation rate on the higher end of the aforementioned 20% to 60% range in lieu of Defendant's proposed 89% violation rate.

In an alternative argument in the original notice of removal, Defendant applied a 50% meal-break violation rate. *See* Dkt. 1 at 9 n.2.  Based on the case law and a reasonable assumption that Plaintiff's experience somewhat reflects that of the proposed class, the Court finds that violation rate reasonable and will apply it to the meal break claim.  Applying that modified violation rate to Defendant's revised calculation yields a $562,977.05 value for this claim before doubling [112,091 * $20.09 * .5 * .5 = $562,977.05], and $1,125,954.10 after doubling.

Regarding Plaintiff's rest break claim, the Amended Complaint alleges that Plaintiff and proposed class members were "at times" denied rest periods or compliant rest periods.  But, she also states categorically that they "failed to provide a second rest break before the eighth hour of work and failed to provide a third rest break prior to the twelfth hour of work[]" and did not compensate her for missed rest periods.  Dkt. 3-10 at 8.  Thus, Plaintiff alleges that first rest breaks were only denied "at times" while successive breaks, where due, were generally denied.

Defendant's proposed 50% violation rate for rest breaks is not tethered to that language.  Nor is it supported by the evidence Defendant offers.  Defendant calculated from its records that the putative class worked 120,354 shifts in the removal period, entitling them to 170,819 rest breaks.  It did not estimate average shift lengths, minimum shift lengths, or otherwise specify whether each shift's length necessarily compelled entitlement to at least one break.  At most, the

data Defendant provides indicates that, of the 170,819 rest breaks due, a maximum of 120,354 were first rest breaks and the balance, 50,465 breaks, were successive rest breaks.

The Court does not find it reasonable to assume the same violation rate for first and successive breaks given the distinct allegations in the Amended Complaint and in view of the better assumptions that may be applied to Defendant's data by parsing out first and successive breaks. The Court therefore takes the first break maximum—120,354 breaks—and the successive break minimum—50,465 breaks—separately.

As to the first breaks, the Court finds Plaintiff's proposed violation rate of 20% appropriate and rooted in her "at times" allegation. Plugging that amended violation rate into Defendant's proposed formula yields a claim value of $161,516.52 after doubling for first rest breaks [120,354 * $20.09 * .167 * .2 = $80,758.26].

For successive rest breaks, or 50,465 rest breaks, a 20% violation rate is not appropriate given Plaintiff's allegation of categorical denial. Defendant's proposed 50% violation rate, which presumably accounted somewhat for first break denials, may be too low. The Court need not identify a more reasonable violation rate, however. Even assuming, arguendo, a 100% violation rate for successive rest breaks, and accepting Defendant's assumptions and methodology for valuing Plaintiff's remaining claims, the amount in controversy would not surpass CAFA's minimum. With a 100% violation rate, the second break claim totals $338,623.18 after doubling [50,465 * $20.09 * .167 * 1 = $169,311.59]. Adding together the first and successive break claim values after doubling, the amount in controversy for the rest break claim totals $500,139.70.

///

///

ORDER GRANTING MOTION TO REMAND - 16

b.      *Minimum Wage Claim*

Plaintiff does not challenge Defendant's minimum wage claim calculation and adopts its estimate.  The Court will do the same.  Applying Defendant's modified workweeks assumption and formula, that claim totals $289,647.58 before doubling [28,835 * $20.09 *.5 = $289,647.58] and $579,295.16 total after doubling.

Together, the meal period, rest period, and minimum wage claims after doubling total $2,205,388.96.

c.      *Overtime Wages Claim*

Defendant conceptualized Plaintiff's overtime claim under two theories:  (1) uncompensated time represented by her other claims that, once accounted for, nudged weekly hours worked over forty and triggered overtime rates, and (2) time over forty hours allegedly shaved off time records and left uncompensated.  That approach fairly reflects the Complaint's allegations, and the Court adopts it.

The Court starts with the second theory.  Plaintiff alleges in her pleading that "based on information and belief, Defendant[] engaged in unauthorized time editing and/or shaving, including but not limited to, deleting hours worked over forty (40) in a workweek from the system[.]"  Dkt. 3-10 at 9.  In her Reply, Plaintiff does not appear to take issue with Defendant's time shaving overtime calculation, which assumes a violation rate of 20% of workweeks, with one hour compensable as time-and-a-half shaved/deleted each week.  Those assumptions are not unreasonable and the Court will credit them.  Thus, that component of the overtime claim totals $173,788.55 [28,835 * $20.09 * .2 * 1.5 = $173,788.55], or $347,577.10 after doubling.

Moving to the first theory, Defendant's assumption that the entire class worked overtime with the same frequency as Plaintiff, or 49% of the time, is not clearly supported by the language

ORDER GRANTING MOTION TO REMAND - 17

in the Amended Complaint and undermined by data Defendant submits as evidence.  In her Amended Complaint, Plaintiff alleges that she and other putative class members "sometimes worked more than forty hours per week for which they were not paid overtime compensation." *Id.*  Defendant has not put forth evidence indicating the percentages of individuals in the class as a whole that may have worked sufficient weekly hours to qualify for overtime pay or the percentage of its workforce that held full versus part-time roles.  *See* Dkt. 15 at 15.  However, the payroll data Defendant provides is somewhat instructive.  The average number of shifts worked per week, relying on the 120,354 shifts Defendant asserts were worked over the course of 28,835 workweeks, was 4.17.  Assuming those shifts averaged eight hours long, then, on average, workweeks would total 33.36 hours—a total that is substantially below the forty hours needed to trigger overtime rates.  And looking at the rest break data, which assumed eligibility for a rest break after four hours, and continuing with the Court's assumption that all shifts were at least four hours long so as to trigger entitlement to at least one rest break, then a maximum 30% of shifts overall triggered entitlement to a successive rest break by meeting or exceeding eight hours [(170,819 - 120,354) / 170,819 = .3].  Considering those figures together, and that a sufficient number of shifts of sufficient length would be needed to trigger overtime liability, the Court finds that it is not reasonable to extrapolate Plaintiff's individual overtime frequency of 49% to the entire class.  That rate ought to be revised downwards.

But, again, the Court need not actually decide a more reasonable violation rate because, even applying a 49% violation rate, the amount in controversy does not meet the CAFA's minimum.  Applying a 49% violation rate to Defendant's proposed formula, and with adjustments for other claim totals as determined *supra*, this component of the overtime claim totals $1,080,640.60 after doubling [$2,205,388.96 x .49 x .5 = $540,320.30].

ORDER GRANTING MOTION TO REMAND - 18

Together, both components of the overtime claim amount to $1,428,217.70 after doubling. Adding up all claims after doubling, they total $3,633,606.66 [$1,125,954.10 (meal breaks) + $500,139.70 (rest breaks) + $579,295.16 (minimum wage) + $1,428,217.70 (overtime) = $3,633,606.66].

                d.     *Attorney's Fees*

Defendant supports its 25% attorney's fees assumption by pointing to a case indicating Plaintiff's counsel has sought over 25% of the recovery amount in fees in other employment cases. *See* Dkt. 13 at 14; *Greene*, 965 F.3d at 774 n.4 ("Based on Harley-Davidson's evidence that Greene's attorney sought 35 percent in a similar case, it is reasonable to assume that Greene's attorney would seek fees equal to 25 percent of the amount in controversy if he were to prevail."); *Reynolds v. Autozone Parts, Inc.*, No. C25-5328-BHS, 2025 WL 2437267, at *3 (W.D. Wash. Aug. 25, 2025) (Defendant "persuasively provides evidence that Reynolds's own counsel[, Crosner Legal,] has sought up to one-third of the recovery in prior employment actions."). If Plaintiff's counsel intended to take the case pro bono or seek less than 25% of the recovery amount in fees, Plaintiff could have filed proof of their agreement or an affidavit to that effect. She opted not to. Assuming arguendo a 25% attorney's fee award, the amount in controversy would fall far under the threshold, totaling only $4,542,008.33. Because the amount in controversy is not met, remand is proper.

///

///

///

///

///

ORDER GRANTING MOTION TO REMAND - 19

IV.    CONCLUSION

Defendant has not shown, by a preponderance of the evidence, that the amount in controversy exceeds $5 million as required under CAFA.  Plaintiff's Motion to Remand, Dkt. 9, is therefore GRANTED and this action REMANDED to King County Superior Court.

Dated this 25th day of June, 2026.

_____
S. KATE VAUGHAN
United States Magistrate Judge